Filed 8/11/16  P. v. Cardoso CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE JERONIMO CARDOSO et al.,<br><br>    Defendants and Appellants. | F069505<br><br>(Super. Ct. No. 13CM0278)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Robert Shane Burns, Judge.

Kim Malcheski and John P. Dwyer, under appointments by the Court of Appeal, for Defendant and Appellant Jose Jeronimo Cardoso.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Raymond Charles Mendez.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Jennevee H. de Guzman, and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jose Jeronimo Cardoso and Raymond Charles Mendez (Cardoso and Mendez, respectively; collectively, defendants) stand convicted, following a jury trial, of premeditated attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664, subd. (a); count 1) and discharging a firearm at an inhabited dwelling house (§ 246; count 2). As to each count, the jury found defendants personally, and a principal personally, used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm proximately causing great bodily injury (§ 12022.53, subds. (b)-(d)); the offense was committed for the benefit of and in association with a criminal street gang (§ 186.22, subd. (b)); and defendants personally inflicted great bodily injury (§ 12022.7, subd. (a)). Defendants' motions for a new trial were denied, and defendants were sentenced to total unstayed terms of life in prison with 15 years' minimum parole eligibility plus 25 years to life, and were ordered to pay various fees, fines, and assessments.

On appeal, we reject defendants' claims of prejudicial prosecutorial misconduct and ineffective assistance of counsel. While we conclude the evidence was sufficient to sustain the jury's true findings on the gang enhancements, we conclude those enhancements nevertheless must be reversed due to the erroneous admission of defendants' answers to jail booking questions. Accordingly, we affirm in part, reverse in part, and remand the matter to the trial court for retrial of the gang enhancements and/or resentencing. We also order correction of Mendez's custody credits.

---

[1] All statutory references are to the Penal Code.

## FACTS

### *The Charged Offenses*

As of January 2013, Christian Hernandez had been seeing Anisa Rosales off and on for about a year.[2] They broke up in September 2012, when Hernandez learned she was seeing Cardoso.[3] Hernandez saw Rosales frequently and continued to have a sexual relationship with her, even after they broke up. Hernandez never confronted Cardoso about Cardoso's relationship with Rosales.

Hernandez was at Rosales's house late on the night of January 22. Around midnight, someone knocked on the window. Hernandez was curious who was knocking at the window so late, but Rosales would not answer him. The couple argued and Hernandez — who believed Cardoso had been at the window — choked Rosales, then called 911 to have himself arrested.[4] A police officer came and took Hernandez to the

---

[2]   Unspecified references to dates in the statement of facts are to the year 2013.

[3]   According to Rosales, who testified under a grant of immunity, she and Hernandez broke up around the end of January 2012, because Hernandez physically abused her on multiple occasions. Hernandez was violent and jealous and always carried a gun. Rosales began dating Cardoso in February 2012, and continued to see him until January 2013. During that time, Cardoso did not have a car. A few days before the shooting, however, she saw Cardoso driving a small silver car that looked like a Honda. She saw Cardoso with an older, rusted, western-type revolver a week or a few weeks before the shooting. Cardoso knew about Hernandez, because Hernandez would "blow up" Rosales's phone every day. Rosales never heard Cardoso say he wanted Hernandez dead. However, Hernandez said on numerous occasions that he wanted Cardoso dead, because Rosales wanted to be with Cardoso rather than Hernandez. Hernandez continually harassed and threatened Cardoso and Cardoso's family, and Rosales and her family.

Rosales met Mendez one time, a week or a few weeks before the shooting. He was with Cardoso.

[4]   According to Rosales, she was going to let Hernandez stay the night with her, because he had nowhere to go. There was a knock on her window; when she went to the door, it was Cardoso, who asked to come in. She told him no and to calm down and they would talk, but he did not calm down and just left. She went back inside. Hernandez knew who had come to the door, and was angry about it, so he asked her to have sex. She said no, that she was with Cardoso, and that was what started the

3.

Tulare County-Kings County line and dropped him off. Hernandez telephoned his mother to come and pick him up.[5]

Sometime after 1:00 p.m. on January 23, Avila dropped Hernandez off at Fernot and Lassen, in Hanford, to visit his friend Elijah Crockett. Crockett, who lived at the Kings Garden Apartments in the 1200 block of Fernot Way, and Hernandez spent some time outside the apartments, then Crockett went to his aunt's house on the corner of Fernot. He stayed 30 to 45 minutes, as his uncle, Jose Mims, had just gotten out of the hospital.

Hernandez stood by the curb in front of the house for about 30 minutes, waiting for Crockett. A silver compact car containing defendants and Rosales drove slowly by.[6] Hernandez made eye contact with them. Because they were driving so slowly and looking at him, he felt awkward. He had not had problems with either defendant before that day.

Hernandez watched the car go by. It went to Fernot and Lassen, stopped, and then quickly made a U-turn.[7] Hernandez started running toward the backyard of the house Crockett was in. Things "just didn't feel right," and he ran through the partly open gate.

argument. Hernandez got on top of her on the bed and put his hands around her throat. She yelled for her mother, who told Hernandez to get out.

[5] According to Anita Avila, Hernandez's mother, Hernandez called her around midnight and asked if she could pick him up at Rosales's house. He said he was afraid and that one of the defendants was outside with a gun. Avila was unable to go, however. About 30 minutes later, Hernandez called again and asked if Avila could pick him up at the Kings County line. Avila went and got him.

[6] Defendants were in the front seat. Hernandez could not recall which one was driving. Rosales was in the backseat. Hernandez knew Cardoso as Squiddy, but had never talked to either defendant. Hernandez had telephoned Rosales that day to tell her he was coming to town. When he first talked to the police after getting shot, he did not say anything about Rosales being in the car.

[7] The segment of Fernot Way involved in this case is intersected on one end by Lassen Drive and on the other end by Connie Drive.

4.

Someone from the car yelled something, but he did not remember what or know which person yelled. He then got shot. He heard one shot. The next he could remember, he was lying on the ground and Crockett was tying a shirt around his arms and leg. He did not see any guns and did not know who shot him.

Martha Alvarez, who lived in the 1200 block of Fernot Way, was outside with her three young children, who were playing on the sidewalk, when she heard shots from two guns. She turned and saw two hands outside the windows of a silver or gray car. The car went by "really fast" and turned on Connie Drive. She could not tell how many people were in the car or see their faces.

Around 3:00 p.m. on January 23, Tonya Navarro was walking near the corner of Connie Drive and Fernot Way as her two little daughters played in the area. She heard four or five gunshots from a four-door gray car that went by. There were two men inside, but she did not see their faces and could not tell their ethnicity. When the shots were fired, she thought she saw a hand with a gun sticking out the front passenger side window. She could not tell which person in the car pointed the gun. She saw the driver point out of the passenger side when the car went by after she heard the shots.

Jose Quinto was walking on Lassen when he saw Hernandez, a childhood friend he knew as Big C. Hernandez was "just chilling." As Quinto walked on, he heard gunshots. He ran back to find Hernandez on the ground, shot. Quinto called 911.

Cardoso was Quinto's cousin. Quinto saw him in a silver four-door car on Lassen on the day of the shooting. Quinto did not see if anyone else was with him.

At approximately 3:00 p.m. on January 23, Jose Mims was resting in his home in the 1200 block of Fernot Way when he heard six shots, one right after the other. Mims called the police.

Officer Ricks responded to Mims's residence to find Hernandez on the ground in the backyard. Tourniquets around Hernandez's right arm and leg were covered in blood, and he seemed to be going in and out of consciousness. He appeared to have multiple

gunshot wounds. When Ricks asked if Hernandez knew who shot him, Hernandez said he was not sure, but there were two of them in a white two-door car.[8]

Eight spent .380 shell casings were found in the roadway. There were nine bullet holes in the wooden fence that faced the street along the northeast corner of Mims's address. There were two more bullet holes in the back fence. Two wad cutters — a type of projectile mostly used for target shooting with a revolver — and two copper bullets were recovered from the fence and the yard. A copper bullet was found underneath Hernandez. One bullet entered the wood under the eve of the residence just above where Hernandez was lying.

On the evening of January 23, members of the Kings County Gang Task Force attempted to find defendants. Officer Perryman went to the area in which Mendez's mother reportedly lived. Seeing someone fitting Mendez's description, Perryman activated the emergency lights on his vehicle. Mendez stood where he was for a brief period as if surprised, then ran. There was a brief chase; Mendez attempted to run across a plowed dirt field, fell several times, and was taken into custody. A semiautomatic .380 handgun, chrome with black grips, was subsequently found on the ground near one of the places where Mendez had fallen. It had a round in the chamber and seven more rounds in the magazine. It was subsequently determined the spent cartridge casings found at the scene of the shooting were fired from this gun. The two wad cutters found at the scene

---

[8] All told, Hernandez was shot seven times in his right leg, right thigh, right arm, right shoulder, left shoulder, and right lower back. He underwent two operations. He was unable to walk and was confined to a wheelchair for almost three months, then had to use a walker for another month following the shooting.

When Detective Lemos interviewed him at the hospital following the shooting, Hernandez related Cardoso had been in the driver's seat of the silver vehicle and Mendez in the front passenger seat. Hernandez said he had had problems with them in the past, including a physical fight about a year before the shooting. Hernandez said both defendants were laughing at him as they drove toward him. He thought they both had guns, but he did not actually see a gun.

were not fired from this gun. It could not be determined whether the copper bullets had been.

On January 23, Detective Mathews viewed video recorded by a security camera mounted on a house on Connie Drive, near Fernot. The video depicted a four-door Honda Civic Hybrid arriving in the area. Shortly after, popping sounds could be heard. The same or a similar vehicle could then be seen leaving in the opposite direction at a high rate of speed.

Mathews checked the police department's record system and found a report of a stolen 2012 silver Honda Civic Hybrid. He had the dispatch center send a "be-on-the-lookout" for that vehicle. On the afternoon of January 24, he was notified the Lemoore Police Department had located the vehicle. Although no shell casings or other indications of gun use were found in the car, two prints from Cardoso's little finger were found on the right side of the rearview mirror inside the vehicle.[9] None of the usable prints matched those of Mendez.

Police had a hard time finding Quinto, who finally came to the police station on his own on January 24. Mathews interviewed him that day. Quinto seemed angry at being put in such a situation, and concerned about his safety.

During the interview (the recording of which was played for the jury), Quinto related he had been walking from his mother's house on Connie Drive, when he saw "two dudes mugging" in a gray car. The two, who were White, asked if Quinto was Mexican and did he "bang." After asking him more questions, they said they were "fucking with" him, and he walked away. As they left, they put on some music, then he heard shots. Quinto ran back and saw Hernandez was on the ground, shot. Quinto called an ambulance and stayed with Hernandez until the police arrived.

---

[9]     The car was stolen from outside Kim Harrison's residence in Hanford sometime in early January. Neither defendant had permission to use the vehicle.

Quinto initially denied knowing the people in the car. Eventually, however, he related his cousin, Cardoso, was one of them. Quinto stated he did not know the other person. When Quinto saw Cardoso, Quinto was at Lassen and Fernot. Cardoso yelled at him to get out of there.

Quinto admitted Cardoso and Hernandez had "been having a beef for a long time." Quinto was not sure, but thought "the beef" was over Rosales. Quinto said he had talked to Rosales the day before the shooting to ask why Cardoso was mad. Quinto had seen Cardoso a week before, and Cardoso and Hernandez had been "trippin on each other." When Cardoso pulled up on the day of the shooting and told Quinto to get out of there, Quinto knew something was going to happen. Quinto related that Cardoso was driving the car, but he insisted he did not know the person with him and had never seen him before.

Quinto related that he was walking past the house where Hernandez was shot when he saw Hernandez. Hernandez was standing alone in front of the big gate in the alley. Quinto greeted him, then kept walking. He was a little past Lassen and Fernot when he saw Cardoso come from Connie and turn on Fernot. Cardoso pulled up and told Quinto to get out of there. Quinto was halfway down Lassen when he heard the gunshots and started running back.

Quinto told Mathews that he had never seen Cardoso with a gun, and did not see a gun that day. The car was gray and looked like a Focus. Quinto thought it had four doors. Cardoso was driving.

Quinto denied setting Hernandez up. He stated he did not know how Cardoso knew Hernandez was there. He did not know if Rosales might have told him; she and Quinto's sister were friends, and Quinto believed Rosales liked both Hernandez and Cardoso.

Mathews showed Quinto a single photograph of Cardoso. Quinto identified him as his cousin, who was driving the car. Mathews also showed him a photographic lineup that included Mendez's picture. Quinto was unable to identify anyone.

<em>The Gang Evidence</em>

Hernandez was never an actual member of a gang, but started associating with Northerners/Norteños when he was 14 years old. He had friends who were Northerners. He stopped associating with them about a year before trial, because he got tired of them. Although this made some of the Northerners in town angry and they would "[t]alk trash" to and about him, there had been no repercussions. When he associated with Northerners, he did not associate with either defendant, although he sometimes saw them around town.

Hernandez was not affiliated with any particular subset. He generally knew who the Northerners were in Hanford. He would say both defendants were Northerners.

Rosales thought Hernandez used to be a Northerner. She did not know if Cardoso was in a gang, but thought he and Hernandez "[p]ossibly" were in the same gang. Rosales told Mathews the conflict between Cardoso and Hernandez was "somewhat" a "gang thing." She did not recall, but may have told Mathews that Cardoso was a South Side Loc. She did not know if Mendez was a Norteño.

Officer Vallin of the Hanford Police Department testified as an expert on Kings County Norteño street gangs. He had been assigned as an investigator with the Kings County Gang Task Force for almost two years as of the time of trial. He had also had that assignment in 2008. He had received approximately 260 hours of formalized gang training, dealing with identification of gang members, documentation of gang members, trends in gangs and their association, how to investigate gang-related crimes, and other related issues.

As a gang investigator, Vallin had investigated crimes committed by Norteños in Kings County. Those crimes included vandalism, homicides, attempted homicides,

9.

drive-by shootings, carjackings, vehicle thefts, and robberies. He had investigated crimes, including batteries, assaults, drive-by shootings, and stabbings, in which Norteños were victims. In the course of these investigations, he had opportunities to talk to Norteños who were suspects, victims, or witnesses. He also had consensual contacts with gang members and people in gang-infested neighborhoods. These types of contacts were made on a daily basis.

Vallin testified there were approximately 2,500 documented Norteño gang members and/or associates in Kings County as of the time of trial, and that Norteños were an ongoing gang with many rivals, including Sureños. Vallin explained Norteños associate with the color red and number 14. The number 14 represents the 14th letter of the alphabet — N — which stands for Norteño or Nuestra Familia. Nuestra Familia is the prison gang that is the overall authority with respect to the Norteño street gangs, all of which are subsets of the Nuestra Familia. Vallin explained that subsets are just different groups that fall under the Norteño umbrella. All the Norteño subsets in Kings County get along with each other, although Norteño subsets fight against each other in different parts of the state and country. In Hanford, the Norteño subsets are South Side Locs, Varrio Home Gardens (VHG), North Side Gangsters (NSG), and generalized Norteños who do not claim a specific subset but associate with different groups. Hernandez was an example of a generalized Norteño.

The primary activities of the Norteño criminal street gang include homicide, attempted homicide, felonious assaults, assaults with firearms, shooting at inhabited dwellings, robberies, and burglaries. For instance, on February 1, 2011, Ernesto Medina and two other South Side Loc gang members shot at a group they believed to be rival gang members, at 12th Avenue and Hanford Armona Road in Hanford.[10] Vallin opined

---

**10**    Copies of various court documents, showing Medina's conviction for assault with a firearm, were admitted into evidence.

Medina was a Norteño criminal street gang member based on a vehicle stop that occurred June 26, 2008, in Hanford, in which Medina was noted to have one dot tattooed on one hand and four dots tattooed on the other hand (representing the number 14), and to be wearing a red hat and white tennis shoes with red laces. Vallin also relied on the fact Medina was booked into juvenile hall on June 13, 2008, at which time a threat assessment gang classification form was filled out and he was documented as a South Side Loc Norteño street gang member with the moniker "Ernie," as well as the fact that on April 14, 2009, he was ordered by the court to register as a gang member.

Vallin gave another example in which Steven Aguilar was arrested, on January 11, 2010, for shooting at a rival gang member at 10th Avenue and Myrtle Street in Hanford.[11] Vallin opined Aguilar was a Norteño criminal street gang member based on several contacts. On February 12, 2003, Aguilar was booked into jail, and admitted being a South Side Loc gang member. On October 3, 2004, Aguilar was contacted by a sheriff's sergeant, who noted Aguilar had "14" tattooed under his eye.

With respect specifically to Cardoso, a threat assessment classification form was filled out when he was booked into jail, and jail staff documented him as a Norteño/Northerner. According to Vallin, gang members typically want to be placed with their fellow gang members, because they can conduct gang business and also for safety purposes. It could be dangerous for a gang member to be placed with a rival gang.

On August 20, 2008, Vallin investigated a stabbing in which David Williamson, Eric Zuniga, and Jennifer Williamson were arrested for stabbing Michael Garcia and Henry Turpin. Zuniga was a documented VHG gang member, and the Williamsons were also Norteño street gang members. During the course of the investigation, it was learned

---

[11] Copies of various court documents, showing Aguilar's conviction for assault with a firearm, were admitted into evidence.

Cardoso, whose moniker was Squiddy, was also involved in the stabbing.[12]  When Cardoso was taken into custody on October 8, 2008, and booked into jail, he admitted he was a Norteño associate.

On January 25, 2013, Cardoso was booked into jail in connection with the present case.  During the booking process, he admitted he was a Northerner while incarcerated, and a South Side Loc street gang member while "on the street."

Vallin opined Cardoso was a Norteño criminal street gang member.  His opinion was based on all the contacts with Cardoso that Vallin had reviewed, Cardoso's self-admissions, his associations with other Norteño street gang members, and the criminal acts he committed with other Norteño street gang members.

With respect to Mendez, he was contacted on January 18, 2005, in the area of 10th Avenue, south of Hanford Armona Road, by a sheriff's deputy.  The deputy noted he was wearing several items of red clothing, and that he had four dots tattooed on the knuckles of his left hand and one dot on his right hand.

On February 22, 2007, Mendez was booked into juvenile hall.  He was documented as a North Side Gangster gang member, with the moniker Little OG.  Mendez advised the booking officer that he had been jumped into the gang.[13]

On March 8, 2007, during a probation contact, the probation officer documented that Mendez had NSG tattooed on his right forearm.  Mendez told the probation officer he had been a North Side Gangster for three years, was jumped into the gang, and his moniker was Little OG.

---

[12]    In Vallin's experience, VHG and South Side Locs tend to get along and commit crimes together.

[13]    In Vallin's experience, NSG members get along and commit crimes with South Side Locs.

On April 23, 2010, Mendez was booked into jail. During the booking process, he answered affirmatively when asked if he was a Norteño street gang member and/or associate while incarcerated as well as on the streets.

On April 19, 2012, Mendez was booked into jail. During that process, he admitted being a Northerner, and said he was a North Side Gangster gang member.

On January 23, 2013, Mendez was booked into jail in the present case. During the booking process, he was asked if he was a member of a street gang, and if he was a member of a gang while incarcerated. Mendez responded affirmatively, and said he was part of the Norteños, to both questions.

Vallin opined Mendez was a Norteño criminal street gang member.

With respect to testimony at trial that Hernandez was a dropout, Vallin explained a dropout is someone who is a gang member or associate but basically stops associating with the gang and "hangs it up." As the gang mentality is somewhat "blood in, blood out," gang members do not like it when people drop out. Because people within the gang are privy to information known only to gang members, such as drug and gun transactions, who is on a hit list, who is considered no good, and how the gang's criminal enterprise works, someone defecting from a specific gang is not taken lightly by that gang. That person is now considered no good and may be subject to violent repercussions as a result. Norteño dropouts are viewed negatively by Norteños. Dropping out is seen as disrespecting the gang.

Vallin explained that disrespect played into the present case in a couple of ways. First, Hernandez disrespected the gang by dropping out. In addition, Hernandez was having relations with Rosales, who was possibly dating Cardoso. It showed disrespect to Cardoso that his girlfriend was having relations with a dropout from the gang Cardoso was with. It was also disrespectful to Cardoso that Hernandez choked Cardoso's girlfriend. According to Vallin, there are rules about Norteños not having sex with or disrespecting each other's girls. This rule is contained in the set of 14 bonds (rules)

13.

established by the Nuestra Familia, bond four of which states Norteños are not supposed to disrespect fellow Norteños. Violating that bond is supposed to lead to serious repercussions, which can mean a multitude of things in the gang lifestyle, including being beaten or murdered, or having family members hurt. If an individual like Cardoso is wronged and does not take action, he can be viewed as being weak and as "not being down" for the criminal gang enterprise itself. This could result in repercussions being taken against him by the gang.

Vallin was involved in an investigation that resulted in Hernandez going to prison for sales of methamphetamine. During the investigation, several grams of methamphetamine, together with weapons, were found during a search of Hernandez's residence. According to Vallin, one of the Norteños' enterprises was selling illegal narcotics. When gang members sell narcotics, they are expected to "pay taxes," meaning send part of their proceeds back to the gang, with that money in turn sent off to the gang hierarchy within the prison system. It was disrespectful to the Norteños that Hernandez was taking business away from the Norteños and not paying taxes, because he was a dropout. If the gang took no action against him, it would be considered weak by rival gang members.

Vallin opined the crimes in the present case were committed for the benefit of the Norteño criminal street gang. First, the crimes attempted to remove a dropout from their gang who was showing them disrespect. Taking him out violently sent a message to rival gangs, and also could hinder other gang members who were considering defecting. The acts were done in broad daylight, when there were people and even children around. The more fear gang members instill in citizens by committing such acts, the less likely citizens will be to call law enforcement, due to fear of retaliation. This allows the criminal street gang to conduct its business in broad daylight without fear of being reported. In addition, by committing the act, Cardoso's individual standing within the Norteño criminal street gang may have been enhanced, and he may now be viewed as

14.

someone who not just follows orders but also gives them, and who is "down to do whatever" for the gang. Mendez's individual status could be benefited for the same reasons.

Vallin also opined the crimes were committed in association with a Norteño criminal street gang. Defendants are Norteño criminal street gang members and committed the crimes in association with each other.

## DISCUSSION

### I

#### PROSECUTORIAL MISCONDUCT

Defendants contend the prosecutor committed misconduct by misstating the law relevant to attempted voluntary manslaughter, and by appealing to jurors' passions. We conclude their claims have not been preserved for appeal.

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

"In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]' [Citation.]" (*People v. Parson*, *supra*, 44 Cal.4th at p. 359.) "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable

15.

likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 121.) "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

Finally, although "a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel" (*People v. Thompson*, *supra*, 49 Cal.4th at p. 121, fn. 14), "[a] defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored. [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

## A.     Misstatements of the Law

With respect to count 1, jurors were instructed on attempted voluntary manslaughter, based on sudden quarrel or heat of passion, as a lesser included offense of attempted murder. The instruction told jurors, in pertinent part: "A defendant attempts to kill someone because of a sudden quarrel or in the heat of passion if the defendant . . . attempted the killing because he was provoked, and the provocation would have caused *an ordinary person of average disposition to act rashly and without due deliberation, that is, from passion rather from [sic] judgment*. . . . It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. [¶] You must decide whether the defendant was provoked and whether the provocation was sufficient. In decision [sic] whether the provocation was sufficient, consider *whether an ordinary person of average disposition in the same situation in [sic]*

16.

*knowing the same facts would have reacted from passion rather than judgment*." (Italics added.)

The emphasized portions correctly state the law. In *People v. Beltran* (2013) 56 Cal.4th 935, the California Supreme Court rejected the argument that, in order to constitute heat of passion and reduce murder to manslaughter, the provocation must be "of a kind that would cause an ordinary person of average disposition *to kill*." (*Id*. at p. 938.) The high court observed that nearly 100 years ago, it "explained that, when examining heat of passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.] The proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment." (*Id*. at pp. 938-939.) The court further explained: "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Id*. at p. 949.)

Despite the fact the California Supreme Court has long framed the issue as being whether the provocation was of a kind as would cause ordinary persons of average disposition to act rashly (see, e.g., *People v. Carasi* (2008) 44 Cal.4th 1263, 1306; *People*

17.

*v. Manriquez* (2005) 37 Cal.4th 547, 583-584; *People v. Borchers* (1958) 50 Cal.2d 321, 329), the prosecutor here gave the following "classic example of heat of passion, attempted involuntary [*sic*] manslaughter."**14**

> "A man comes home early from work. . . . He walks into his house, he goes to the bedroom, he opens the door and he see's [*sic*] his wife in bed with another man. The man who comes home from work feels such an intense emotion. He has been betrayed by somebody so close to him, and he feels so much emotion and you can — and any reasonable person could feel it, could understand or would know what that shock is. *That shock that would want [sic] any reasonable person to want to kill* either his wife, or whoever was with his wife. It is that intense shock, emotion, betrayal, and that shock and emotion *causes this person to want to reach out, take a gun, and shoot his wife and her lover,* but he doesn't kill her. That is the classic example of involuntary [*sic*] manslaughter. *The provocation that would cause a reasonable person to instantly want to kill someone* because they have experienced so strong of an emotion, or so strong of a shock and they did not get a chance to cool down, think about what they're going to do but they just act on it." (Italics added.)

The portion of the prosecutor's argument concerning a person not thinking about what to do but just acting, is unobjectionable. The italicized portions, however, are legally incorrect. (See *People v. Trinh* (2014) 59 Cal.4th 216, 232-233; *People v. Beltran*, *supra*, 56 Cal.4th at pp. 938-939, 949-951.)

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.) Nevertheless, because nothing suggests a timely objection would have been futile and an admonition would have cured the harm,

---

**14** The reporter's transcript reflects the prosecutor as referring, in several instances, to involuntary manslaughter rather than voluntary manslaughter. In light of the fact jurors were not instructed on involuntary manslaughter and the reporter's transcript shows counsel for Mendez making the same misstatements, we are inclined to believe the references to involuntary manslaughter are merely errors in transcription. If counsel did indeed misspeak, we are satisfied defendants suffered no prejudice as a result.

18.

defendants' claim has been forfeited by their failure to object.  (*People v. Centeno* (2014) 60 Cal.4th 659, 674; *People v. Solomon* (2010) 49 Cal.4th 792, 828; *People v. Najera* (2006) 138 Cal.App.4th 212, 224.)  Accordingly, we will address it in the context of ineffective assistance of counsel, *post*.

**B.    Appeal to Jurors' Passions**

In her discussion of the gang enhancement allegations, the prosecutor told the jury, in part:

> "But most importantly is that you have this particular gang member, Mr. Cardoso who is associated with [Rosales].  He is supposed to be the big bad guy in the Norte[ñ]o criminal street gang, and his status is diminished because Mr. Hernandez has the nerve to go out and sleep with his girlfriend.  And not only does he try and sleep with his girlfriend, he actually hits or harms his girlfriend.  So Mr. Cardoso has to take action.  Why?  Because he is going to be considered weak if he doesn't.  His fellow gang members are going to think of him as weak and not for the gang if he let's [*sic*] some dropout have sex with his girlfriend and choke her.  And in that context he goes out, he gets himself Mr. Mendez, gets in a stolen vehicle, drives to a neighborhood in the middle of the day *with children all over the place*, and he shoots into a backyard.  Hits a house and Mr. Hernandez seven times.  Why?  Because it is going to protect his status as a gang member, and might even make him better in the gang by showing the gang that he is bad, he can do what needs to be done.  He can preserve his status in the gang, because he is willing to shoot him up.  The same thing with Mr. Mendez.  They are bad.  They are going to go show the gang that they're down for whatever *by driving into a neighborhood full of children and shooting into a backyard*."  (Italics added.)

Defendants say the prosecutor appealed to the passions and emotions of the jurors by bringing up the irrelevant fact there were children on the street when the shooting took place.  "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.  [Citations.]"  (*People v. Fields* (1983) 35 Cal.3d 329, 362, fn. omitted; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250.)  " 'It is . . . improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory

rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' [Citations.]" (*People v. Redd* (2010) 48 Cal.4th 691, 742-743.)

Once again, defendants failed to object to the prosecutor's remarks. Their claim has, therefore, been forfeited. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1338, 1341-1342; *People v. Redd*, *supra*, 48 Cal.4th at pp. 742-743.) We will address it in the context of ineffective assistance of counsel, *post*.

## C.    Cumulative Misconduct

Defendants contend the cumulative effect of the prosecutor's repeated acts of misconduct during closing argument deprived them of their right to a fair trial. It is true the cumulative effect of prosecutorial misconduct can so prejudice a defendant that reversal is required, even though each instance by itself may not be prejudicial. (See *People v. Hill*, *supra*, 17 Cal.4th at pp. 844-845.) We cannot consider the cumulative effect of errors when none were preserved for appeal, however.

## II

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendants contend they were deprived of their federal constitutional rights to the effective assistance of counsel at trial because their trial attorneys failed to object to the prosecutor's alleged misconduct during closing argument. Cardoso additionally claims his trial attorney relied on the wrong defense at trial, and that he was prejudiced by the cumulative effect of counsel's errors. We find no cause for reversal on appeal.

The same legal standards apply to a determination of ineffective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (*In re Hardy* (2007) 41 Cal.4th 977, 1018-1019; accord, *People v. Benavides* (2005) 35 Cal.4th 69, 92-93; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.) The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "Establishing a claim

20.

of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.] A 'reasonable probability' is one that is enough to undermine confidence in the outcome. [Citations.]" (*People v. Dennis*, *supra*, 17 Cal.4th at pp. 540-541; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

## A.    Failure to Object to Prosecutor's Misstatements of Law

As we concluded, *ante*, portions of the prosecutor's argument concerning provocation and heat of passion incorrectly stated the law. " '[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' [Citation.]" (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467.) Moreover, " '[a] reviewing court will not second-guess trial counsel's reasonable tactical decisions.' [Citation.]" (*Ibid.*) Where a misstatement of the law such as occurred in this case is concerned, however, it is difficult to perceive a reasonable tactical purpose for not objecting. (See *People v. Cash* (2002) 28 Cal.4th 703, 735.)

Accordingly, we turn to the question of prejudice. In this regard, "[i]t is not sufficient to show the alleged errors may have had some conceivable effect on the trial's

21.

outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different. [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) This is the appropriate standard, even if a different standard would have applied had defendants' direct claims of error not been forfeited. (*Id.* at pp. 1008-1009.)

Here, the trial court correctly instructed the jury on the applicable law. During the giving of instructions, it told jurors: "You must follow the law as I explain it to you . . . . If you believe that the attorney's comments on the law conflict with my instructions, you must follow my instructions. Pay careful attention to all of these instructions . . . ." Just before the prosecutor's opening argument, the trial court reminded jurors: "And if either attorney misstates the evidence or the law, you will rely on the evidence as presented in the trial, and the law as stated by me." We presume jurors followed these instructions. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1242; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268-1269; *People v. Najera*, *supra*, 138 Cal.App.4th at p. 224; see *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9; but see *People v. Centeno*, *supra*, 60 Cal.4th at pp. 676-677 [where prosecutor's incorrect hypothetical did not directly contradict trial court's instruction, jury had no reason to reject hypothetical].)

In addition, jurors found defendants acted with premeditation and deliberation. "This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion — even if that state of mind was achieved after a considerable period of provocatory conduct . . . ." (*People v. Wharton* (1991) 53 Cal.3d 522, 572; see *People v. Peau* (2015) 236 Cal.App.4th 823, 831-832.)

Under the circumstances, we conclude defendants have failed to establish prejudice. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 702-703.)

**B.** **Failure to Object to Prosecutor's Remarks Concerning Children's Presence**

Evidence admitted at trial showed children were in the area when the shooting took place. Although at one point the trial court told the prosecutor it had heard enough

concerning gunshots and a car leaving and children playing, the trial court did not suggest (or ever rule) the evidence was irrelevant, but merely that it was becoming cumulative. Significantly, when asked if the Norteño criminal street gang benefited from committing a shooting in a neighborhood in broad daylight, Vallin noted the shooting was committed with people and children around, and that the more gang members instilled fear into regular citizens by committing acts such as this, the less likely people would be to report gang activity to law enforcement, thus making it easier for the gang to conduct its business. The prosecutor commented on the children's presence in her argument to the jury concerning the gang enhancement.

"The prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 647; see *People v. Beivelman* (1968) 70 Cal.2d 60, 76-77, overruled on another ground in *People v. Green* (1980) 27 Cal.3d 1, 33-34.) Under the circumstances, we find "[t]he prosecutor's challenged remark was a fair comment on the evidence and the inferences to be drawn from it. At worst, the prosecutor's characterization of [the neighborhood being 'full of children'] was 'hyperbole' that fell 'within the scope of permissible argument.' [Citation.]" (*People v. Lee*, *supra*, 51 Cal.4th at p. 648.) Accordingly, the prosecutor did not commit misconduct (see *People v. Seumanu*, *supra*, 61 Cal.4th at p. 1343), and so defendants' claim of ineffective assistance of counsel fails (*People v. Thompson*, *supra*, 49 Cal.4th at p. 121, fn. 14).

## C.    Choice of Defenses

Cardoso contends his trial attorney's performance was deficient because counsel relied on the wrong defense at trial, arguing innocence rather than guilt of attempted voluntary manslaughter in the face of virtually unassailable identifications of defendant as one of the perpetrators.

"A defendant who raises the issue [of ineffective assistance of counsel] on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) "This is such a case: the appellate record sheds no light on why trial counsel acted as he did; he was not asked to explain his performance; although we may doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not." (*People v. Bell* (1989) 49 Cal.3d 502, 546.) Thus, we must reject Cardoso's claim on appeal, and leave him to whatever remedy may be available to him in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; *People v. Bell*, *supra*, 49 Cal.3d at p. 546.)

## D.   Cumulative Effect

We have found only one instance of ineffective assistance of counsel, and have determined defendants suffered no prejudice as a result. Defendants' remaining claims of ineffectiveness either lack merit or are outside the scope of this appeal. None of the claims of prosecutorial error were preserved for appeal. Under the circumstances, there was no prejudice to accumulate; hence, we reject any claim defendants were prejudiced by the cumulative effect of errors by the prosecutor and defense counsel.

### III

### GANG ISSUES

## A.   Sufficiency of the Evidence

Defendants contend the evidence was insufficient to support the jury's true finding on the gang enhancements (§ 186.22, subd. (b)), because the prosecutor failed to prove the North Side Gangsters were a criminal street gang within the meaning of

section 186.22, subdivision (f).[15]  We conclude the existence of a criminal street gang was adequately shown.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  Substantial evidence is that evidence which is "reasonable, credible, and of solid value."  (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578.)  An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Reilly* (1970) 3 Cal.3d 421, 425.)  An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367).  This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies equally to convictions and enhancement allegations (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Garcia* (2014) 224 Cal.App.4th 519, 522-523).

The gang enhancements required proof defendants committed the substantive offenses (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal

---

**15**  Mendez raises this argument in his opening brief.  Cardoso joins in the argument, asserting he was alleged to be a member of the same criminal street gang as Mendez. Vallin opined Cardoso was a South Side Loc and Mendez was a North Side Gangster, both of which groups were subsets that fell under the Norteño umbrella.  We analyze defendants' claim as it relates to both subsets.

conduct by gang members." (§ 186.22, subd. (b)(1), (4).) "[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment under the [Street Terrorism Enforcement and Prevention] Act only if the crime is "gang related." ' [Citation.] Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) A crime *is* gang related, however, if, inter alia, it is committed in association with the gang, or it is committed for the benefit of the gang. (*Ibid.*)

Offenses may be found to have been committed "in association" with a gang where the record supports a finding the defendants "relied on their common gang membership and the apparatus of the gang" in committing the crimes. (*People v. Albillar*, *supra*, 51 Cal.4th at p. 60.) Since the requirements of the first prong of the gang enhancement are listed in the disjunctive, if the crime was committed for the benefit of a criminal street gang, it need not also have been committed in association with the gang. A defendant is not required to be an active or current member of the criminal street gang that benefited from his or her crime(s). (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402.)

As part of proof of the gang enhancement, the prosecution must prove the existence of a criminal street gang. The Street Terrorism Enforcement and Prevention Act (the STEP Act) "defines 'criminal street gang' as any ongoing association that consists of three or more persons, that has a common name or common identifying sign or symbol, that has as one of its 'primary activities' the commission of certain specified criminal offenses, and that engages through its members in a 'pattern of criminal gang activity.' ([§ 186.22], subd. (f), italics [omitted].) A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' (*Id*., subd. (e).)" (*People*

26.

*v. Loeun* (1997) 17 Cal.4th 1, 4.)  "Thus, for a group to fall within the statutory definition of a 'criminal street gang,' these requirements must be met:  (1) the group must be an ongoing association of three or more persons sharing a common name or common identifying sign or symbol; (2) one of the group's primary activities must be the commission of one of the specified predicate offenses; and (3) the group's members must 'engage in or have engaged in a pattern of criminal gang activity.'  [Citations.]"  (*Id*. at p. 8.)

A pattern of criminal gang activity can be proven, inter alia, through evidence of the charged offense and another offense committed on a prior occasion by the defendant's fellow gang member (*People v. Gardeley* (1996) 14 Cal.4th 605, 625, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13) or by evidence of the offense with which the defendant currently is charged and proof of another offense committed on the same occasion by a fellow gang member (*People v. Loeun*, *supra*, 17 Cal.4th at p. 5).  A predicate offense can be established by evidence of an offense the defendant committed on another occasion.  (*People v. Tran* (2011) 51 Cal.4th 1040, 1044.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations.  [Citation.]  That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . .  [¶]  Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony . . . ."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324.)  The "primary activities" requirement can be met by proof of either prior conduct or acts committed at the time of the charged offenses.  (*Id*. at p. 323.)

If the prosecution's theory of why a criminal street gang exists turns on the conduct of one or more gang subsets, the prosecution is required "to introduce evidence

showing an associational or organizational connection that unites members of a putative criminal street gang." (*People v. Prunty* (2015) 62 Cal.4th 59, 67 (*Prunty*); see *People v. Williams* (2008) 167 Cal.App.4th 983, 987-989.)

As described in the statement of facts, *ante*, Vallin testified as an expert on Kings County Norteño street gangs. He testified concerning the number of Norteño members and associates in Kings County, Norteños' association with the color red and number 14, and the fact all Norteño street gangs were subsets of the Nuestra Familia prison gang. He testified the Norteño subsets in Hanford — South Side Locs, VHG, and North Side Gangsters — all got along with each other; the South Side Locs and VHG, and the South Side Locs and North Side Gangsters, committed crimes together; and all the subsets were simply different groups that fell under the Norteño umbrella. He also testified there were generalized Norteños in Hanford who did not claim a specific subset but associated with different groups. Finally, he testified the Norteños were an ongoing gang.

Vallin listed the primary activities of the Norteño criminal street gang. These included attempted homicides, assaults with firearms, and shooting at inhabited dwellings. As predicate offenses, Vallin listed an assault with a firearm committed by Ernesto Medina and two other South Side Loc members, and a separate assault with a firearm committed by South Side Loc member Steven Aguilar.

Specifically with regard to defendants, Vallin testified concerning a stabbing in which Cardoso participated with a VHG gang member and two other Norteño members. On various occasions when Cardoso was booked into jail, he admitted he was a Norteño associate.[16] On one occasion, he admitted he was a Northerner while incarcerated, and a

---

[16] We recognize defendants challenge admission of their responses to booking officers' questions as being violative of their rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). However, "when reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, the reviewing court must consider *all* of the evidence presented at trial, including evidence that should not have been admitted." (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) "[W]here the evidence

28.

South Side Loc while not in custody. Vallin opined he was a Norteño criminal street gang member. When Mendez was booked into jail, he variously admitted being a North Side Gangster or part of the Norteños. Vallin opined he was a Norteño criminal street gang member. Vallin further opined the crimes in the present case were committed for the benefit of, and in association with, the Norteño criminal street gang.

"[W]hen the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Prunty*, *supra*, 62 Cal.4th at pp. 67-68.) The question, then, is whether the prosecution sufficiently proved a connection between the Norteño criminal street gang and the South Side Locs (with respect to Cardoso) and/or the North Side Gangsters (with respect to Mendez).[17]

Prunty was charged with attempted murder and assault with a firearm. To prove each offense was subject to a gang enhancement under section 186.22, subdivision (b), the prosecution introduced evidence from a gang expert, Detective Sample. Sample, who interviewed Prunty shortly after the latter's arrest, testified Prunty admitted he was a Norteño gang member and described his membership in the Detroit Boulevard Norteño " 'set.' " Sample also testified Prunty's clothing, previous contacts with law

---

offered by the State and admitted by the trial court — whether erroneously or not — would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 34; accord, *People v. Story*, *supra*, 45 Cal.4th at pp. 1296-1297.)

[17] Neither subset was shown to be a criminal street gang, as defined by the STEP Act, in its own right. Although each was shown to have a common name, and we can surmise the South Side Locs comprises three or more participants who engage in a pattern of criminal gang activity, there was no evidence as to either group's primary activities or from which it reasonably could be concluded the North Side Gangsters comprises three or more participants who engage in a pattern of criminal gang activities.

enforcement, and possession of Norteño graffiti and other paraphernalia were consistent with Norteño gang membership. (*Prunty*, *supra*, 62 Cal.4th at p. 68.) With respect to the prosecution's theory Prunty committed the charged offenses with the intent to benefit the Norteños, Sample testified concerning Norteños in general, and that Norteños in Sacramento (the relevant geographical area) were not associated with any particular " 'turf,' " but were found all over Sacramento with a lot of subsets based on different neighborhoods. (*Id*. at p. 69.) For predicate offenses, Sample described a confrontation between two Norteño gang subsets that resulted in the convictions of two Varrio Gardenland Norteños for a variety of offenses, and an incident in which members of the Varrio Centro Norteños shot at a former Norteño gang member. Aside from Sample's testimony the subsets referred to themselves as Norteños, the prosecution produced no specific evidence showing the subsets identified with a larger Norteño group, or that they shared a connection with each other or any other Norteño-identified subset. (*Ibid*.)

On appeal, Prunty argued the prosecution's use of crimes committed by various Norteño subsets to prove the existence of a single Norteño organization "improperly conflated multiple separate street gangs into a single Norteño gang without evidence of 'collaborative activities or collective organizational structure' to warrant treating those subsets as a single entity." (*Prunty*, *supra*, 62 Cal.4th at p. 70.) The California Supreme Court summarized its conclusion as follows:

> "[W]here the prosecution's case positing the existence of a single 'criminal street gang' . . . turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization.

30.

"Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22[, subdivision ](f) — i.e., that the group committed the predicate offenses and engaged in criminal primary activities — and that the defendant sought to benefit under section 186.22[, subdivision ](b). But it is not enough . . . that the group simply shares a common name, common identifying symbols, and a common enemy. Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group." (*Prunty*, *supra*, 62 Cal.4th at pp. 71-72, fns. omitted.)

The Supreme Court found it "axiomatic that those who commit the predicate acts must belong to the same gang that the defendant acts to benefit. In light of this 'sameness' requirement, the prosecution need not demonstrate the precise scope of an alleged gang, but it must allow the jury to reasonably infer that the 'criminal street gang' the defendant sought to benefit — or which directed or associated with the defendant — included the 'group' that committed the primary activities and predicate offenses." (*Prunty*, *supra*, 62 Cal.4th at p. 76.) Although "[t]he prosecution has the discretion to choose its theory of how a particular gang exhibits an associational or organizational connection," "the evidence must permit the jury to infer a relationship among the group's members." (*Ibid*., fn. omitted.)

The high court offered several "illustrative examples" of how the necessary connection might be shown. (*Prunty*, *supra*, 62 Cal.4th at p. 77.) "The most straightforward cases might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements. Evidence could be presented, for instance, that such subsets are part of a loose approximation of a hierarchy. Even if the gang subsets do not have a formal relationship or interact with one another . . . the subsets may still be part of the same organization if they are controlled by the same locus or hub." (*Ibid*.) "In other situations, formal structure or hierarchy may not be present, but the facts may suggest the existence of behavior reflecting such a degree of collaboration,

31.

unity of purpose, and shared activity to support a fact finder's reasonable conclusion that a single organization, association, or group is present. One possibility in such situations is for prosecutors to show that members of the various subsets collaborate to accomplish shared goals." (*Id.* at p. 78.) "Even evidence of more informal associations, such as proof that members of two gang subsets 'hang out together' and 'back up each other,' can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture. [Citations.] This type of evidence routinely appears in gang enhancement cases. [Citation.] In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang." (*Id.* at pp. 78-79.)

The high court examined the evidence before it and concluded "the prosecution failed to prove the existence of a single 'criminal street gang' within the STEP Act's meaning that fit the prosecution's theory of why the gang enhancement applied in this case. The critical shortcoming in the prosecution's evidence was the lack of an associational or organizational connection between the two alleged Norteño subsets that committed the requisite predicate offenses, and the larger Norteño gang that Prunty allegedly assaulted [the victim] to benefit. The evidence was not sufficient to permit the jury to infer that the organization, association, or group at issue included the subsets that committed the predicate offenses." (*Prunty*, *supra*, 62 Cal.4th at p. 81.) The court noted: "Sample did not describe any evidence tending to show collaboration, association, direct contact, or any other sort of relationship among any of the subsets he described." (*Id.* at p. 82.) In addition, Sample's testimony failed to "demonstrate that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that [the] defendant sought to benefit. Although there was ample evidence that Prunty self-identified as both a member of the Detroit Boulevard

32.

Norteños and the larger umbrella Norteño gang, and that he collaborated with a member of another subset to commit his present offenses, the prosecution presented no evidence that the members of the Varrio Gardenland and Varrio Centro Norteños self-identified as part of the umbrella Norteño gang." (*Id*. at pp. 82-83.)

The court recognized Sample testified Norteño street gangs are associated with the Nuestra Familia prison gang, but found evidence implying the various alleged gang subsets shared a common origin did "not indicate whether the specific subsets involved in committing the predicate offenses have any ongoing relationship — the kind of relationship that amounts to being part of the same group — with the entity the defendant sought to benefit. Sample did not testify, for instance, about any relationship between Nuestra Familia shot callers and any of the Sacramento-area Norteño subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 83.) "To be sure, the prosecution did introduce some evidence of collaboration between members of different gang subsets — namely, Prunty and his companion Emilio Chacon," whom Sample testified was a member of the Varrio Franklin Boulevard Norteños. (*Id*. at p. 84.) Prunty and Chacon met up earlier on the day of the shooting and planned to steal a bottle of liquor from a market in the shopping center where the shooting took place, and Chacon was at least tangentially involved in the confrontation with the shooting victim. (*Ibid*.) The court concluded, however, that "[w]hile this evidence shows collaboration, it does not establish the necessary connection to the Norteño subsets that committed the predicate offenses. Sample did not testify as to any relationship between the Varrio Franklin Boulevard subset and either of the two alleged subsets that committed the predicate offenses. And while the relationship between Chacon and Prunty is some evidence of a larger Sacramento-area Norteño group, the prosecution's case still lacks evidence connecting the Varrio Gardenland and Varrio Centro cliques to that group. The absence of this necessary connection precludes application of the gang enhancement here." (*Ibid*.)

33.

Having carefully read *Prunty* and examined the totality of the evidence presented at defendants' trial, we conclude the evidence before us was sufficient to sustain the jury's true findings on the gang enhancements concerning both defendants. It permitted a reasonable trier of fact to conclude the South Side Locs and North Side Gangsters collaborated in committing crimes, and that there was at least a loose hierarchical relationship between them (as Norteño street gang subsets) and the Nuestra Familia. Significantly, Hernandez was a Norteño associate, but was not affiliated with a particular subset. Yet, defendants joined together in attacking him. Although the evidence was such that a reasonable trier of fact could have concluded the attack had nothing to do with any gang but rather arose from a romantic triangle, it was also such that it was reasonable to conclude Hernandez was attacked by members of different subsets because he dropped out of the Norteño criminal street gang, and because he violated the bond (rule) established by the Nuestra Familia that forbade disrespecting a fellow Norteño. From this evidence, jurors reasonably could have found the requisite connection between the South Side Locs and North Side Gangster subsets, and between those subsets and the overall Norteño criminal street gang in Kings County. (Cf. *People v. Ramirez* (2016) 244 Cal.App.4th 800, 814-816.) Thus, the evidence adequately showed the criminal street gang defendants sought to benefit included the group that committed the primary activities and predicate offenses.

## B.     Admission of Answers to Booking Questions

As set out in the statement of facts, *ante*, the evidence defendants were gang members came from Hernandez's and Rosales's opinions and beliefs; the fact when Mendez was contacted in 2005, he was wearing red and was observed to have one dot tattooed on one hand and four dots tattooed on the other; Mendez's statements to a probation officer in 2007, at which time he was found to have "NSG" tattooed on his forearm; Cardoso's involvement in an apparently gang-related stabbing in 2008; and Vallin's testimony concerning defendants' admissions when threat assessment

classification forms were filled out upon their being booked into jail and (in Mendez's case) the Kings County Juvenile Center.

Vallin opined each defendant was a Norteño criminal street gang member. Although he was not asked the basis for his opinion with respect to Mendez, he testified his opinion concerning Cardoso was based on the contacts he (Vallin) had reviewed, Cardoso's self-admissions, Cardoso's associations with other Norteño street gang members, and the criminal acts Cardoso had committed with other Norteño street gang members. Vallin's opinion the crimes in the present case were committed for the benefit of, and in association with, the Norteño criminal street gang were based in part on his conclusion defendants were Norteño gang members. In her summation, the prosecutor relied solely on Cardoso's booking admissions to refute the argument of Cardoso's counsel that the contacts were old and Cardoso was not in a gang.

Defendants now contend admission of their responses to booking questions violated their rights under the Fifth and Fourteenth Amendments to the United States Constitution, because they were obtained in violation of their *Miranda* rights. They further say the error cannot be proven harmless beyond a reasonable doubt. We agree.

"Under the rule of *Miranda*[, *supra*,] 384 U.S. [at pages] 478-479 . . . , certain admonitions must be given before a suspect's statement made during custodial interrogation can be admitted in the prosecution's case-in-chief." (*People v. Elizalde* (2015) 61 Cal.4th 523, 527 (*Elizalde*).) "[C]ustodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. at p. 444, fn. omitted.) "[I]nterrogation" means express questioning or its functional equivalent, to wit, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301, fns. omitted (*Innis*).) An incriminating response is

35.

any response, whether inculpatory or exculpatory, the prosecution may seek to introduce at trial.  (*Id*. at p. 301, fn. 5.)

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 (*Muniz*), a plurality of the United States Supreme Court recognized "a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' [Citation.]" (*Id*. at p. 601 (plur. opn. of Brennan, J.).)  The court cautioned that " 'recognizing a "booking exception" to *Miranda* does not mean . . . that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' [Citations.]" (*Id*. at p. 602, fn. 14.)

At the time of defendants' trial, application of the booking question exception to booking interview questions and answers about gang affiliation was not completely settled, although such questions and answers generally were found to fall within the purview of the exception.  As *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*) explained:  "[W]hether a question about a suspect's gang affiliation during a booking interview is encompassed by the booking question exception depends upon whether, under all the facts and circumstances, the question was designed to elicit an incriminating response." (*Id*. at p. 627.)  The Court of Appeal advised:  "In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information.  [Citation.]  Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the

relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]." (*Id*. at pp. 630-631.)

Well after defendants' trial was finished, the California Supreme Court disapproved *Gomez*. (*Elizalde*, *supra*, 61 Cal.4th at p. 538, fn. 9.) In *Elizalde*, the state high court considered whether routine questions about gang affiliation, posed to the defendant while he was being processed into jail on murder charges, fell within the booking exception. (*Id*. at p. 527.) The court held: "[T]he questions exceeded the scope of the exception and . . . officers should have known these questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and defendant's pending charges. While officers were permitted to ask these questions for institutional security purposes, defendant's un-*Mirandized* responses were inadmissible against him during the [prosecution's] case-in-chief." (*Ibid*.)

The state Supreme Court declined to delineate the scope of the booking exception in all circumstances, but determined "questions about gang affiliation exceed it." (*Elizalde*, *supra*, 61 Cal.4th at p. 535.) The court reasoned that gang affiliation questions do not conform to the narrow exception contemplated by *Muniz* for basic identifying biographical data; hence, they must be assessed under the *Innis* definition of " 'interrogation' " as "questions the police should know are 'reasonably likely to elicit an incriminating response.' [Citation.]" (*Elizalde*, *supra*, 61 Cal.4th at p. 538.) Applying that test, and considering California's comprehensive scheme of penal statutes aimed at eliminating criminal activity by street gangs, under which substantial punishment could result, the court concluded the gang affiliation questions posed to the defendant were reasonably likely to elicit an incriminating response. (*Id*. at pp. 538-539.) Furthermore, "[t]his likelihood was apparent even if the deputies' subjective intention was benign.

Accordingly, [the defendant's] unadmonished answers to these questions were inadmissible at trial." (*Id*. at p. 540.)

The Attorney General takes the position defendants' booking question claims were not preserved for appeal because defendants failed to make a *Miranda* objection in the trial court. (See, e.g., *People v. Mattson* (1990) 50 Cal.3d 826, 853-854, superseded by statute on another ground as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13; *People v. Bonin* (1989) 47 Cal.3d 808, 845.) A party need not object, however, if doing so would be futile. (*People v. Chism* (2014) 58 Cal.4th 1266, 1291; *People v. Wilson* (2008) 44 Cal.4th 758, 793.)

Given the law on the subject at the time of trial and Vallin's testimony concerning what happens during booking, we believe an objection likely would have been futile.[18] Under the circumstances, we find it appropriate to consider the issue on the merits, rather than find it forfeited and deal with defendants' alternative claims their trial attorneys were ineffective for failing to object. Accordingly, pursuant to *Elizalde*, we conclude it was error to admit, in the prosecution's case-in-chief, evidence of defendants' gang affiliations elicited during booking interviews that were not shown to have followed defendants' advisements and waivers of rights under *Miranda*.[19]

---

[18]    Vallin explained: "What happens at the jail is every time that any individual is brought in for booking, some forms that have to be filled out, a jail nurse, or a medical questionnaire has to be asked of the person being intaked into the jail, as well as a jail classification threat assessment form, and they ask this of every individual. And on those forms are things such as if the person has any family, or if that person is in law enforcement, or any family is in law enforcement, if they ever testified in a case or against somebody. If that person is gang-related, and which gang they belong to. If they are a member or an associate of that gang while incarcerated, and/or on the street. If they are considered a dropout of that specific gang, or if they testified against anybody, they want to house people to make sure that that person is safe, to not put a dropout gang member or a person of a rival gang in with another gang."

[19]    The Attorney General asserts defendants have failed to establish they were *not* advised of their *Miranda* rights prior to booking. If they were so advised by the arresting officer or officers, the argument runs, there would be no error in admitting their

38.

We turn, then, to the question of prejudice. The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment/*Miranda* is assessed under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*Elizalde*, *supra*, 61 Cal.4th at p. 542; *People v. Davis* (2009) 46 Cal.4th 539, 598.) "That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*Elizalde*, *supra*, 61 Cal.4th at p. 542.) "[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

Although the error had no conceivable effect on the jury's guilty verdicts on the substantive crimes or the true findings on great bodily injury and firearm enhancements,[20] we cannot declare it harmless beyond a reasonable doubt with respect to the gang enhancements. In and of itself, gang membership is not a crime (*Elizalde*, *supra*, 61 Cal.4th at p. 539), and it is "neither necessary nor sufficient to establish any

_____

statements concerning gang affiliation if the booking interviews were reasonably contemporaneous with an earlier waiver of their rights. (See, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 386; *People v. Mickle* (1991) 54 Cal.3d 140, 171.)

Generally speaking, "[a] judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. [Citation.]" (*People v. Battle* (2011) 198 Cal.App.4th 50, 62.) Where *Miranda* is concerned, however, the prosecution bears the burden of establishing the requisite admonishment of rights was given and understood, and that the rights were voluntarily and intelligently waived. (E.g., *Miranda*, *supra*, 384 U.S. at p. 444; *People v. Bennett* (1976) 58 Cal.App.3d 230, 236-237; *People v. Stewart* (1968) 267 Cal.App.2d 366, 378.) The Attorney General cites no authority to the contrary.

[20] Although jurors found true, as to each offense, that a principal intentionally discharged a firearm and caused great bodily injury to Hernandez, they also found true that each defendant personally and intentionally discharged a firearm and caused great bodily injury to Hernandez within the meaning of section 12022.53, subdivision (d). Defendants do not challenge these findings.

element of the gang enhancement. [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 132.) Nevertheless, it is relevant to, and often of substantial import to the proof and determination of, one or more elements of that enhancement. (See, e.g., *People v. Albillar*, *supra*, 51 Cal.4th at pp. 60, 62.)

Here, independent evidence defendants were gang members at the time of the charged offenses was scarce. (Cf. *Elizalde*, *supra*, 61 Cal.4th at p. 542; *People v. Leon* (2016) 243 Cal.App.4th 1003, 1021-1022.) Evidence the crimes were committed for gang-related, as opposed to personal, reasons was far from overwhelming. Vallin and the prosecutor both relied heavily on the erroneously admitted evidence in their presentations to the jury. (See *People v. Cruz* (1964) 61 Cal.2d 861, 868; *People v. Diaz* (2014) 227 Cal.App.4th 362, 384; cf. *People v. Leon*, *supra*, 243 Cal.App.4th at p. 1011.)

Under the circumstances, we are unable to conclude the jury's true findings on the gang enhancements were " 'surely unattributable to the error.' [Citation.]" (*People v. Quartermain*, *supra*, 16 Cal.4th at p. 621.)[21] Accordingly, we will reverse the findings. Because they are supported by sufficient evidence, however, the People are free to retry the section 186.22, subdivision (b) allegations.

## IV

### CUMULATIVE PREJUDICE

Mendez contends the cumulative prejudice from evidentiary errors and prosecutorial misconduct violated his right to a fair trial. We have concluded defense counsel was ineffective for failing to object to the prosecutor's misstatements of the applicable law, but that Mendez was not prejudiced thereby. We have also determined the erroneous admission of evidence requires reversal of the gang enhancements. Even taken together, these errors "do not undermine the fairness of the trial as a whole or affect

---

[21]    We would conclude defendants were prejudiced even under the standard applicable to claims of ineffective assistance of counsel.

any other portion of the judgment." (*People v. Pearson* (2012) 53 Cal.4th 306, 327; see *People v. Thomas* (2011) 51 Cal.4th 449, 489.)

## V

### MENDEZ'S CUSTODY CREDITS

Mendez was awarded 491 days of actual credit plus 73 days of local conduct credit for a total of 564 days. Based on the fact he was arrested January 23, 2013, and sentenced May 30, 2014, he contends he should have been awarded 493 days of actual credit, making his total 566 days. (See, e.g., *People v. Ravaux* (2006) 142 Cal.App.4th 914, 919-920; *People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.) The Attorney General appropriately concedes the error.

## DISPOSITION

The Penal Code section 186.22, subdivision (b) enhancements on each count are reversed as to both defendants. After the filing of the remittitur in the trial court, the People shall have 30 days in which to file a written election to retry defendants on the Penal Code section 186.22, subdivision (b) enhancement allegations. If they do not timely file such an election, and/or do not bring defendants to retrial on said allegations within the time set forth in Penal Code section 1382, subdivision (a)(2) — 60 days unless waived by defendants — the trial court shall proceed to resentence defendants. Upon resentencing (whether or not following retrial), the trial court shall recalculate Mendez's custody credit in accord with this opinion.

In all other respects, the judgment is affirmed.

_____
DETJEN, Acting P.J.

WE CONCUR:

_____
FRANSON, J.

_____
SMITH, J.

41.